**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **KIMBERLY JO MARTIN,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL No. 4:25-cv-40068-MRG** |
| ) | |
| **THE WHITINSVILLE GOLF CLUB,** ) | |
| **DOMINIC RESTAGNO, Individually, and** ) | |
| **ANTHONY GUERRA, Individually,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**ORDER ON DEFENDANTS DOMINIC RESTAGNO'S AND ANTHONY GUERRA'S MOTION TO DISMISS [ECF. No. 18]**</u>

**GUZMAN, J.**

Ms. Kimberly Martin ("Martin" or "Plaintiff") brings this action against her former employer, the Whitinsville Golf Club ("WGC" or "Club"), and two individual Defendants Dominic Restagno ("Restagno") and Anthony Guerra ("Guerra"), who previously held leadership roles and were members of the WGC at all relevant times. Martin alleges claims of sex-based wage discrimination, retaliation, discriminatory interference and coercion, tortious interference with contractual relations, and age discrimination in violation of Massachusetts and federal law. [See Compl., ECF No. 1]. Defendants Restagno and Guerra move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [See Defs.' Mot. Dismiss, ECF No. 18].

1

Before the Court is a Motion to Dismiss related to: Counts VI, Retaliation under M.G.L. ch. 151B §4(4A) ("Chapter 151B"); Count IX, Discriminatory Interference and Coercion under M.G.L. ch. 151B §4(5); and Count X, Tortious Interference with Contractual Relations.[1] For the reasons stated below, the Defendants' motion is **DENIED**.

## I.    **BACKGROUND**

The following relevant facts are taken primarily from the allegations in Plaintiff's Complaint, [Compl.], and are accepted as true for purposes of this motion. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (explaining that a reviewing court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."). All plausible inferences are made in Plaintiff's favor. Id.

### A.  **Relevant Facts**[2]

The Whitinsville Golf Club is a private, member-owned golf club. [Compl. ¶ 7]. Martin commenced her employment with WGC on October 18, 2021, when Guerra, in his capacity as then-President of WGC, executed a General Manager Contract Agreement between the WGC Board of Governors and Martin. [Id. ¶ 8 (citing Exhibit A, ECF No. 1-3)]. Her one-year contract was renewed by then-President Edward Zywien on February 20, 2023, effective through December 31, 2024. [Compl. ¶ 10].

---

[1] Plaintiff, in her Opposition to the Motion to Dismiss voluntarily dismissed Count V (Retaliation under Title VII) against the Individual Defendants as Title VII does not provide for a claim of individual liability. [Pl.'s Opp'n Defs.' Mot. Dismiss, ECF No. 20 at 1]; see 42 U.S.C. §2000-e.
[2] Martin asserts in her complaint additional facts to support her claims of sex-based wage discrimination and age-discrimination that relate to WGC's alleged conduct. [Compl., ¶¶ 11, 52-58]. These facts are not included in this Order, as they are not pertinent to the claims related to Defendants' Motion to Dismiss before the Court.

i. *Alleged Harassment*

Martin alleges that during her employment at WGC, she experienced multiple instances of sexual harassment and gender discrimination, which reflect the prevalent discriminatory culture of WGC. The incident at the crux of this case was on August 12, 2023, during the evening after the WGC men's invitational golf tournament. [Id. ¶¶ 12-14]. Martin alleges that on that night, Defendants Restagno and Guerra, and members of WGC's third-party catering company, Labeck LLP, were drinking at the Club bar where Martin was working. The conversation between the Club members and the contracted staff devolved into "sexually obscene" content, including remarks on Martin's breast size, showing videos of anal penetration of the pig that was later cooked and served to guests, euphemisms for sexual activity, and other visually explicit behavior. [Id. ¶¶ 14-19].

Within the next few days, Martin spoke to the Labeck LLP workers about their behavior and reported the details of the evening to WGC President Zywein and WGC Vice President Peter Castellanos ("Castellanos"). [Id. ¶ 20]. Martin and three of her staff members, including her friend and colleague Melissa Peterson ("Peterson"), later filed a written complaint regarding the behavior of Restagno, Guerra, and the Labeck staff. [Id. ¶ 21].

The following week, WGC hosted another tournament where Castellanos required Martin to play as the golf partner to a WGC member who had previously made unreciprocated and unwelcomed romantic advances. [Id. ¶ 22]. Martin asserts that Castellanos was aware of these unwelcomed advances when he required her to play with the member, and that the member was never reprimanded for his behavior. [Id. ¶¶ 23-24]. After this event, Castellanos required Martin to play with the member again, and Martin refused [Id.]

###### ii. *Alleged Retaliation*

On September 25, 2023, WGC held a disciplinary hearing for Restagno and Guerra. [Id. ¶ 25]. Martin was not allowed to attend the disciplinary hearing, in violation of WGC's bylaws. [Id.] After the meeting, Castellanos instructed Martin to spend most of her shifts in her office, rather than out on the floor. [Id. ¶ 26].

On October 3, 2023, Zywein informed Martin via e-mail that Restagno and Guerra were suspended from the Club for 60 days, and that Restagno had resigned from the WGC board. [Id. ¶ 27]. Martin and Peterson were informed by Zywein and Castellanos that their complaints against Restagno and Guerra were not being treated as sexual harassment violations, but violations of WGC's "Code of Conduct," because of the "financial effect that another sexual harassment complaint would have on WGC." [Id. ¶ 27]. [3] Martin was later instructed by Castellanos to stop referring to the "August incident" as sexual harassment. [Id. ¶ 28]. Martin asserts that after the incident, Castellanos would sit at the Club bar and disparage Martin to other Club members. [Id. ¶ 29].

In November 2023, Martin learned that her bar budget was cut in half, despite increased costs of supplies and WGC's changed expectation that she hosts more events as a condition for receiving her bonus. [Id. ¶ 30]. In addition to the lower budget, Martin asserts that Restagno and Guerra each took a fraudulent medical leave from WGC after their suspensions and convinced other WGC members to boycott the Club in protest of Martin's presence as General Manager. [Id. ¶¶ 31-32]. The boycott, according to Martin, was meant to incentivize WGC to fire her as General

---

[3] Martin asserts that a similar harassment incident occurred previously at WGC with a fellow bartender who alleged that she had been the subject of inappropriate sexual touching and language by a Club member. The Club member was later promoted to the House Committee that oversaw the bartending staff, and the female complainant was terminated from her employment. [Compl., ¶ 64].

Manager, as the boycotting members did not pay their Club dues, and the absence of Restagno, Guerra, and their friends at the bar led to a noticeable drop in alcohol sales. [Id. ¶¶ 32-33]. This boycott was paired with several disparaging remarks from Club members aligned with the Defendants. [Id. ¶ 34].

In December of 2023, Martin received a negative year-end review from Castellanos because she was unable to reach the financial goals set for the bar, and as a result, only received $3,500 of her potential $10,000 bonus. [Id. ¶ 35]. Martin responded to the review noting the "constant negative, harassing, and hostile behavior from members of WGC." [Id. ¶ 36]. In January 2024, WGC presented Martin with a contract amendment that would permit Martin or WGC to terminate their prior contract before its then-existing expiration date of December 2024. [Id. ¶ 37]. Castellanos informed Martin that the amendment was "for her benefit" since he could terminate her at any time as an at-will employee. [Id. ¶ 38]. Martin refused to sign the amendment. [Id.]

In February 2024, Martin was no longer invited to attend the board meetings she had habitually attended, and the meeting minutes "falsely claimed" that Martin was absent due to vacation. [Id. ¶ 40]. Martin asserts that Castellanos began ignoring her attempts to greet him for the remainder of her employment. [Id. ¶ 41].

  *i. Termination*

In April 2024, Restagno and Guerra filed a civil suit against WGC and Martin in Worcester Superior Court, alleging defamation and intentional infliction of emotional distress in connection to Martin and Peterson's complaint in August 2023. [Id. ¶ 42].[4]  In July, Martin noted in her self-evaluation that it was not possible to meet the goals set by WGC with her budget cuts; nonetheless,

---

[4] The parties note in their filings and oral argument that Restagno and Guerra never effectuated service of their suit on Martin and their claims against Martin were dismissed administratively. [Compl. ¶ 43; ECF No. 36].

she received high marks in her mid-year review from WGC House Committee Chair Bill Himebaugh. [Id. ¶¶ 45-46]. In August, Zywien and WGC Director John Polucha ("Polucha") informed Martin that the Defendants would drop their state court lawsuit if WGC did not renew Martin's contract, effectively terminating her employment. [Id. ¶ 47]. Martin began to hear rumors that her contract would not be renewed. [Id. ¶ 50].

In November, Martin was formally told by Himebaugh that her contract would not be renewed, and that her termination was "not performance-based." [Id. ¶ 51]. The official reason given to members was that Martin's termination was a "reorganization of [ ] management strategy." [Id. ¶ 52]. On December 31, 2024, Martin's contract lapsed without renewal. [Id. ¶ 55].[5] WGC replaced Martin with Mark Aldrich as General Manager and gave him a raise. [Id. ¶ 53]. WGC then created a new "Restaurant and Bar Manager" position, with reduced salary and responsibilities from Martin's previous role. Martin informed WGC of her interest in the new position, but she was not offered the role. Peterson applied for the new job and was subsequently told that her role as Assistant General Manager was eliminated effective January 1, 2025. [Id. ¶¶ 54, 56, 59-60]. Additionally, Martin's son, who previously performed custodial and bartending services for WGC, had his work duties and hours significantly reduced after Martin's termination and was required to do additional cleaning work not expected of other bartenders. [Id. ¶¶ 61-62].

### B.  Procedural History

Martin filed this action in federal court on May 21, 2025. [Compl.] The WGC filed a timely answer to the complaint. [ECF No. 5]. After an initial review of the Complaint, the Court issued a Show Cause Order for Martin to address whether she adequately exhausted the administrative

---

[5] The Court notes that Plaintiff alleges that her contract lapsed on December 31, **2025**. The Court presumes that this is a typographical error given the context of the pleadings.

process before filing a civil suit in court as required under Title VII and Mass. Gen. Law ch. 151B ("Chapter 151B"). [ECF No. 8]. Martin filed her response to the Order to Show Cause within the permitted window by the Court, proving that she had dually filed a complaint for discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"). [ECF No. 10].

On June 26, 2026, the individual defendants filed the Motion to Dismiss presently before the Court. [ECF No. 18]. The parties filed their requisite opposition and replies. [ECF Nos. 20; 29]. On October 15, 2025, the Court heard arguments related to the Motion to Dismiss and the three counts at issue. [ECF No. 36].

## II.    LEGAL STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). When deciding a 12(b)(6) motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (citing Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005). At the pleading stage, a plaintiff is not required "to plead facts sufficient to establish a prima facie case,"

but "those elements are part of the background against which a plausibility determination should be made." Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013). At this stage, a "plaintiff must allege a series of facts which at the very least gives rise to an inference of discriminatory animus." Johnson v. Gen. Elec., 840 F.2d 132, 138 (1st Cir. 1988).

In this case, the Defendants have raised the affirmative defense of untimeliness, which "may be raised in a motion to dismiss, provided that the facts establishing the defense are clear on the face of the plaintiff's pleadings." Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (cleaned up) (quoting Santana-Castro v. Toledo-Davila, 579 F.3d 109, 113-14 (1st Cir. 2009).

## III.    DISCUSSION

Martin brings three claims under state law against Defendants Restango and Guerra for (1) Retaliation under Chapter 151B, §4(4A); (2) Discriminatory Interference and Coercion under Chapter 151B, §4(5); and (3) Tortious Interference with Contractual Relations. [See Compl.]. Martin brings an additional eight counts under Title VII, 42 U.S.C. § 2000e-2(a)(1), Chapter 151B, and state law against WGC which are not at issue in this Motion to Dismiss. [Id.]

### A.    COUNTS VI and IX: Chapter 151B Claims

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a)(1). Massachusetts law similarly prohibits discrimination of "race, color, religious creed, national origin, sex, gender identity, sexual orientation" and additional immutable characteristics. Mass. Gen. Laws ch. 151B § 4(1). Chapter 151B allows a private right of action against individuals, "employer[s], labor organization[s] or employment agenc[ies] alleged to have committed the unlawful practice complained of . . . ." Mass. Gen. Laws ch. 151B § 5; see Mass. Gen. Laws ch. 151B §§1, 4. "Although Chapter 151B has been interpreted largely to mirror Title VII . . . the Supreme Judicial

Court of Massachusetts at times construes the Massachusetts statute more broadly to effectuate the legislature's directive to apply it liberally." Thornton v. Ipsen Biopharmaceuticals, Inc., 126 F.4th 76, 81 (D. Mass. 2025) (internal quotation and citations omitted). One difference between the liberal application of Chapter 151B versus Title VII is its potential application to individuals, such as supervisors, for their personal liability in sexual harassment and gender discrimination suits. Beaupre v. Cliff Smith & Assocs., 738 N.E. 2d 753, 764 (Mass. App. Ct. 2000); Martin v. Irwin Indus. Tool Co., 862 F. Supp. 2d 37, 40-41 (D. Mass. 2012) (explaining supervisors and non-supervisory employees may be found liable under Chapter 151B); Sisco v. DLA Piper LLP, 833 F. Supp. 2d 133, 146 (D. Mass. 2011) ("Unlike Title VII, Chapter 151B explicitly imposes liability on individuals.") (citing Mass. Gen. Laws ch. 151B, §§ 4(4A), (5)).

## A. TIMELINESS

Defendants assert that the majority of Martin's action is untimely because she filed her charge with MCAD on February 14, 2025, and the look-back window of 300 days does not cover many of the allegations asserted in the Complaint. [ECF No. 19 at 4 (". . . allegations that Defendants sexually harassed Plaintiff in August 2023 (over 550 days prior to the filing of the charge), convinced other WGC members to boycott WGC (over a year prior to the filing of the charge), or engaged in other conduct prior to April 20, 2024 (over 300 days prior to the filing of the charge))]. Martin, in her Opposition to the Motion to Dismiss, argues that she has properly asserted a retaliatory hostile work environment claim to which the continuing violation doctrine applies. [ECF No. 20 at 2]. Therefore, she argues, the instances spanning from August 2023 should not be analyzed as discrete adverse employment actions but represent "sufficiently severe or pervasive" conduct that created an abusive working environment. [Id. at 3]. Additionally, she argues both in her pleadings and at oral argument, [ECF No. 36], that even if the Court were to

agree with Defendants that *some* of the allegations associated with the Chapter 151B claims are untimely, that does not apply to Martin's eventual termination from WGC, and does not impact the claims brought under other statutes and state law that do not have similar time restraints. The Court agrees with Plaintiff, in part.

Chapter 151B requires plaintiffs to file charges with MCAD within 300 days of experiencing the adverse action alleged. Mass. Gen. Laws. Ch. 151B, §5. A plaintiff may then proceed in a civil suit on their claim if they receive a right to sue letter from MCAD, or if they do not receive a response after ninety days of filing. Id. §§ 5, 9. A civil action must be filed within three years of the adverse employment action. Id. § 9.

At the outset, the Court must differentiate between a substantive hostile work environment claim and a retaliatory hostile work environment claim since the analysis of these claims differ both in their elements, and how they relate to the continuing violation doctrine.

Since 2006, the Supreme Court has recognized that Title VII, 42 U.S.C. § 2000(e)-2(a), is composed of two separate provisions, the substantive provision or "antidiscrimination provision," which "seeks [to secure] a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status," and "[t]he antiretaliation provision [which] seeks to secure or advance enforcement of the Act's basic guarantees." Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 63 (2006) (referencing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-01 (1973)). The difference between the two provisions, according to the Court, is that the antidiscrimination provision, "seeks to prevent injury to individuals based . . . on status," while the "retaliation provision seeks to prevent harm to individuals based on . . . their conduct." Burlington Northern, 548 U.S. at 63.

The First Circuit has adopted this understanding of Title VII and extended the analysis to the state equivalent, Chapter 151B. See Stratton v. Bentley Univ., 113 F.4th 25 (1st Cir. 2024). In Stratton, the Court clarified that for a hostile work environment claim based on the substantive provision of Title VII, a Plaintiff must prove that there was a level of harassment so "severe or pervasive" that it "materially altered the conditions" of their employment. Id. at 43 (citing Noviello v. City of Bos., 398 F.3d 76, 92 (1st Cir. 2005)). However, in a retaliation claim the standard is more lenient, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well *might have dissuaded* a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern, 548 U.S. at 68 (citing Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (emphasis added); Stratton, 113 F.4th at 43 ("Given the muddled state of our case law on this issue, we take the opportunity here to say, definitively, that Noviello's standard in the retaliation context is no longer appropriate. . . [Therefore,] Burlington Northern's 'might-have-dissuaded' standard unequivocally applies to all Title VII retaliation claims. . . .").

After clarifying the differences between substantive versus retaliatory claims under Chapter 151B, following case precedent developed how the continuing violations doctrine would apply. In the case of Rae v. Woburn Pub. Sch., the First Circuit clarified the differences in the equitable tolling doctrine. 113 F.4th 86, 102 (1st Cir. 2024). The continuing violations doctrine under a hostile work environment theory pursuant to a substantive discrimination claim, may be asserted by plaintiffs "as 'an equitable means of ensuring that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before [they] could be expected to realize that the individual acts were discriminatory in nature.'" Rae, 113 F.4th at 103 (citing Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 144 (1st Cir.

2012). Under the continuing violations doctrine, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Rae, 804 F.3d at 102 (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002)). The event within the statute of limitations is considered an "anchor" for a "series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer v. Stop & Shop Supermarket Co., 750 N.E. 2d. 928, 936 (2001).

However, the standard differs for retaliation claims, even under a retaliatory hostile environment theory. "Retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice." Noviello, 398 F.3d at 87. "[T]he continuing violations analysis requires disaggregating each discrete act of alleged retaliation before assessing whether the continuing violations doctrine is applicable." Rae, 113 F.4th at 103. Related "'discrete acts' cannot be combined 'into a single unlawful practice for the purposes of timely filing.'" Rae, 113 F.4th at 103 (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 (2002)). Generally, a "retaliation claim accrues as a discrete act of discrimination 'when it has a crystallized and tangible effect on the employee and the employee has notice of both the act and its invidious etiology.'" Rae, 113 F.4th at 102 (citing Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 34 (1st Cir. 2015)). In the Court's analysis of the 300-day look back, "[i]t is the retaliatory action performed by the defendant . . . which must fall within the 300-day timeliness window, *not the protected activity performed by the plaintiff*." Ferrao-Rivera v. Puerto Rico Dep't of Educ., 783 F. Supp. 3d 628, 639 (D.P.R.), reconsideration denied, 788 F. Supp. 3d 262 (D.P.R. 2025) (emphasis added); see 42 U.S.C. § 2000e-5(e)(1) ("[A] charge shall be filed by or on behalf of the person aggrieved within

three hundred days after *the alleged unlawful employment practice occurred . . ..*") (emphasis added).  "Each discrete discriminatory act starts a new clock for filing charges. . . the statute is triggered upon the initial occurrence of the discrete adverse employment action, even if the effect of the employer's [actions] continues to be felt by the employee for as long as he remains employed." <u>Ayala v. Shinseki</u>, 780 F.3d 52, 57-58 (1st Cir. 2015) (citations omitted).

Since Martin brings a claim of retaliation under Chapter 151B, §4(4A), it is improper to apply the continuing violations doctrine in this case. Therefore, specific to the allegations under Chapter 151B, the Court may only view allegations related to retaliatory acts that occurred after April 20, 2024 (300 days prior to Ms. Martin's filing). The Court recognizes the protected activity(i.e., Martin's complaint regarding the August 2023 incident) to be the relevant protected activity at issue. Martin's claims pursuant to other statutes are not impacted by this 300-day look-back window.

### i.  COUNT VI: Retaliation under M.G.L. 151B §4(4A)

Martin asserts that sometime after Restagno and Guerra were suspended from the Club, beginning on October 3, 2023, the two Defendants coordinated a boycott among Club members to stop paying WGC dues and avoid the Club bar as retaliation for Martin's complaint of sexual harassment. [Compl. ¶¶ 31-33, 83-84]. Additionally, Martin asserts that Restagno and Guerra filed suit on April 24, 2024, against WGC and Martin alleging defamation in retaliation for her protected activity. [<u>Id.</u> ¶¶ 85-86]. In August 2024, Defendants offered to drop their suit against WGC if they terminated Martin. [<u>Id.</u>]

As discussed previously, the Defendants assert that these allegations are untimely, and that they fail as a matter of law. Defendants Guerra and Restagno argue that Martin cannot succeed on the merits of a retaliation action because (1) Defendants Restagno and Guerra cannot be liable as

they were not Martin's *superiors* or *employers* and therefore did not have the power to terminate her, (2) that Martin cannot prove that their actions were a motivating factor for WGC's decision not to renew Martin's contract, and (3) the defendants' lawsuit does not constitute retaliation under Massachusetts law.  [See ECF No. 19].

Under Mass. Gen. Laws ch. 151B, §4(4) ("Chapter 151B"), it is unlawful for "**any person**, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because [s]he has opposed any practices forbidden under [Chapter 151B] or because [s]he has **filed a complaint**, testified or assisted in any proceeding" alleging a violation of Chapter 151B. Mass. Gen. Laws ch. 151B, §4 (emphasis added). Specific to a claim of retaliation, it is unlawful under Chapter 151B, §4(4A),

> . . . **for any person to coerce, intimidate, threaten, or interfere with another person** in exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

(emphasis added).

To establish a claim of retaliation under Chapter 151B, a plaintiff is required to show that "(1) they engaged in legally protected conduct; (2) they suffered an adverse employment action; and (3) there existed a causal relationship between their protected conduct and the adverse action . . . ." King v. City of Boston, 883 N.E.2d 316, 473 (Mass. App. Ct. 2008). The McDonnell-Douglas burden-shifting framework applies to retaliation claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973). For an employer, once a Plaintiff makes a prima facie case of retaliation, "the burden swings to the defendant 'to articulate a legitimate, non-retaliatory reason for its employment decisions.'" Abril-Rivera v. Johnson, 806 F.3d 599, 608 n.10 (1st Cir. 2015) (quoting Gerald v. Univ. of P.R., 707 F.3d 7, 24 (1st Cir. 2013)). "If a defendant can do this then

the burden travels once more to the plaintiff to show that the reason is pretext, and that retaliatory animus was the real motivating factor." Id. (quoting Gerald, 707 F. 3d at 24).[6]  Additionally, in a retaliation action, the plaintiff has the burden to show that their employer would not have taken the adverse action but for their "desire to retaliate." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013) (distinguishing between the "motivating factor" and "but-for" causation standards in substantive discrimination claims versus retaliation claims under Title VII.).

   i.     *Timeliness*

Here, Plaintiff argued at oral argument, [ECF No. 36], that her retaliatory hostile work environment claim was cognizable after the Individual Defendants filed their lawsuit against her and WGC on April 25, 2024, and became aware of Restagno and Guerra's offer to "drop their lawsuit if WGC did not renew Martin's contract," in August 2024.  [Compl. ¶¶ 42, 47]. The Court agrees that any and all allegations of retaliation against the Individual Defendants must fit the 300-day look-back window, which began on April 20, 2025. It is unclear how long the alleged economic boycott occurred, and whether it fell into this relevant period of time. Therefore, the defamation suit and following actions are included in this analysis, while the facts alleged for the economic boycott may give the Court perspective on what was occurring at WGC at the time, but cannot be considered for purposes of liability for the Chapter 151B claims.

Accordingly, the actionable acts of retaliation include only the filing of the state court complaint and the settlement negotiations with WGC.

   ii.    *Supervisor role / Employment relationship*

---

[6] Of note, because "Massachusetts is a pretext only jurisdiction, a plaintiff 'need only present evidence from which a reasonable jury could infer that the employer's facially proper reasons given for its action against her were not the real reasons for the action" to survive motion pleadings. Theidon v. Harvard Univ., 948 F.3d 477, 505 (1st Cir. 2020) (quoting Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016)).

The Defendants argue that they cannot be held liable for Retaliation under Chapter 151B, §4(4A) because they were not Martin's *superiors* or *employers* and therefore did not have the power to terminate her. The Defendant's reading of Chapter 151B, §4(4A) is too narrow.

There is sufficient law in the First Circuit, and from the MCAD itself to support the Court's interpretation of Chapter 151B §4(4A). The First Circuit has noted that "individual liability for non-employer or non-employer agents is supported by decisions from the Massachusetts Commission Against Discrimination. . . which are 'accorded deference in interpretation of ch. 151B.'" Martin v. Irwin Indus. Tool Co., 862 F. Supp. 2d 37, 39 (D. Mass. 2012) (citing Barton v. Clancy, 632 F.3d 9, 20 n.8 (1st Cir. 2011). In the case of Erewa v. Reis, the MCAD determined that Chapter 151B, specifically Chapter 151B, §4(4A), could hold individuals liable "for employment discrimination where the individual is not an employer or the agent of the employer." Martin, 862 F. Supp. 2d at 39 (citing Erewa v. Reis, 20 M.D.L.R. 36, 38 (MCAD 1998)) (emphasis added). The MCAD, in that case, and following decisions, determined that "the words 'any person' could not be interpreted, standing alone, to require any relationship to any employer." Id. (collecting cases). An employment relationship is not required to impose liability under §4(4A). See Soni v. Wespiser, 239 F. Supp. 3d 373, 384 (D. Mass. 2017); Thomas O'Connor Constructors, Inc. v. MCAD, 893 N.E.2d 80 (Mass. App. Ct. 2008) (holding that §4(4A) liability may extend outside of the employment unit). Therefore, the fact that Defendants Restango and Guerra were not employers or supervisors does not preclude them from liability.

Now that the Court has addressed whether the defendants may be liable in the abstract, it turns to the analysis of the elements for retaliation. Martin's complaint against the Defendants in August 2023 represented protected activity covered under Chapter 151B, §4(4A). Martin asserts that she suffered an adverse action when Guerra and Restagno filed a state court defamation suit,

which the Defendants later used as leverage to have her terminated from her role as General Manager at WGC. [Compl. ¶¶ 85-88]. Martin alleges that the civil suit had no legitimate basis in law or fact. [ECF No. 20 at 9]. Defendants argue that they have a right to seek judicial resolution of disputes and "there was never any intent to harass her or interfere with her employment." [ECF No. 19 at 8].

There is a balance between the constitutional right to seek judicial resolution of disputes "against the competing statutory right to be free from employment discrimination." Lopez v. Comm., 978 N.E.2d 67, 78 n. 14 (Mass. 2012). This right to petition is considered by the Supreme Court as one of "the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers v. Illinois Bar Ass'n, 389 U.S. 217, 222 (1976). However, the right to petition is not absolute. Litigation that is "baseless and subjectively motivated by an unlawful purpose[]," are not protected. Sahli v. Bull HN Info. Sys., Inc., 774 N.E.2d 1085, 1091 (2002) (citing first, Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); citing second, BE & K Constr. Co. v. NLRB, 122 S. Ct. 2390, 2399 (2002)). A lawsuit filed by an employer against an employee that has a legitimate basis in law, "does not violate the provision of either §4(4) or (4A), absent evidence that the employer's purpose is other than to stop conduct it reasonably believes violates the terms of [its] contract" with the employee. Sahli v. Bull HN Info. Sys., Inc., 774 N.E.2d 1085, 1092 (Mass. 2002). Here, the individual defendants are not employers attempting to cure a violation of a contract. See Sahli, 774 N.E.2d. However, they argue that the same standard addressed in Sahli should apply. [ECF No. 19 at 7 n.7].

This case is distinct from Sahli, because the retaliatory conduct at issue is derived from a civil suit for defamation and intentional infliction of emotional distress. Martin was never served in the case and was administratively dismissed. The Defendants then offered to settle the case with

WGC is exchange for Martin's termination. Soon after the settlement discussions, Martin began to hear rumors that her contract would not be renewed. [Compl. ¶¶ 47, 50-51]. Since the civil case remains pending before the state court, this federal court will not determine whether the claims presented were *baseless*. However, after accepting all factual allegations as true and drawing all reasonable inferences in Martin's favor, the Court believes at this initial pleading stage, that Martin has asserted enough facts to sufficiently allege that Restagno and Guerra's suit were motivated by an unlawful purpose to retaliate, and that the effect of this suit may dissuade a reasonable worker from asserting their rights.

    *iii.*    *Causation*

Finally, Defendants argue that they cannot be held liable for Retaliation because Plaintiff cannot prove that her protected activity was a "but-for" cause for her termination. [ECF No. 19 at 5].

Under Massachusetts state law and Title VII, retaliation claims require proof that "the protected activity was a but-for cause of the alleged adverse action by the employer." Ing v. Tufts Univ., 81 F. 4th 77, 84 n. 5 (1st Cir. 2023). In a retaliation claim, the plaintiff's protected activity must not be merely one of the employer's motivations for "an adverse action." Univ. of Tex. Sw. Med. Ctr, 570 U.S. at 359-60.

To determine whether the Defendants' settlement negotiations were the but-for or a motivating factor for WGC's ultimate termination of Martin is an issue for discovery. Arbor Networks, Inc. v. Ronca, No. 12-11322-FDS, 2012 U.S. Dist. LEXIS 162583, at *16 (D. Mass. Nov. 14, 2012) (holding that the "plaintiff has raised a right to relief above the speculative level" and was therefore "entitled to discovery.").

Accordingly, Defendants' Motion to Dismiss Count VI will be **<u>DENIED.</u>**

ii. **COUNT IX: Discriminatory Interference and Coercion under M.G.L. ch 151B §4(5)**

Martin brings a claim of Discriminatory Interference and Coercion under a theory of "aiding and abetting" under Mass. Gen. Laws ch. 151B, §4(5). [ECF No. 20 at 12-14]. Defendants argue in their reply that Martin's aiding and abetting claim fails because she does not allege a "shared intent" with WGC to discriminate against her, and that Defendants were unaware "of their supporting roles" in her termination. [ECF No. 29 at 11].

Section 4(5) makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." Mass. Gen. Laws ch. 151B, § 4(5).

To establish a claim for aiding and abetting under Chapter 151B, Plaintiff must show: (1) that the defendant committed "a wholly individual and distinct wrong . . . separate and distinct from the claim in main"; (2) "that the aider or abettor shared an intent to discriminate not unlike that of the alleged principal offender"; and (3) that "the aider or abettor knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed to him or her under Mass. Gen. Laws ch. 151B." Lopez v. Commonwealth, 978 N.E.2d 67, 82 (Mass. 2012). An aiding and abetting claim is entirely derivative of a discrimination claim. Fisher v. Town of Orange, 885 F. Supp.2d 468, 476-77 (D. Mass. 2012) (citing Abramian, 731 N.E.2d at 1088). This means that in addition to the "individual and distinct wrong" that Defendants must be alleged to have committed, the Complaint must also allege the commission of an underlying act of discrimination by the principal offender. Lopez, 978 N.E.2d at 82 (citing Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1066 n.7 (Mass. 2002)).

As previously analyzed, the filing of the civil defamation suit, at this stage in the pleadings, is viewed by this court as a wholly individual and distinct wrong of retaliation, separate and distinct from the claims against WGC for retaliation and gender discrimination. The claims of discrimination by WGC are not before this Court in this Motion to Dismiss, and the Court will not determine the validity of those claims without the proper motion practice and argument. Given the facts asserted by Plaintiff in this case, Martin has plausibly alleged that the Individual Defendants and WGC shared an intent to retaliate against Martin due to the reputational concerns posed by her August 2023 complaint and financial considerations. [Compl. ¶¶ 27-28, 64]. The argument that Defendants were unaware of their supporting roles in Martin's termination, is unpersuasive as it was their civil action and negotiations at issue here that may have led to the non-renewal of her employment contract.

For similar reasons as to Count VI, the Defendants' Motion to Dismiss Count IX will be **<u>DENIED</u>**.

### B. <u>COUNT X: Tortious Interference with Contractual Relations</u>

Martin alleges that Guerra and Restagno improperly and maliciously interfered with her employment contract with WGC and coerced WGC and its members to illegally retaliate against her for exercising her rights. [Compl. ¶ 110]. Defendants argue that Martin cannot prove that they *knowingly* interfered with her employment with WGC or that their actions were performed with actual malice. [ECF No. 19 at 10-11]. The Court is not persuaded by this argument.

To bring a claim for tortious interference with a contract or business relationship under Massachusetts law, a Plaintiff must prove that:

> 1) the plaintiff had a contract or advantageous business relationship with a third party, 2) the defendant knowingly induced the third party to break the contract or to forgo the business relations, 3) the defendant's interference was improper in motive or means, and 4) the plaintiff was harmed by the interference.

Kelleher v. Lowell General Hospital, 152 N.E. 3d 126, 132-33 (Mass. App. Ct. 2020) (citing Psy-Ed Corp. v. Klien, 947 N.E.2d 520 (Mass. 2011)). "To satisfy the third element, plaintiff must allege 'wrongfulness beyond the interference itself.'" Cummings v. City of Newton, 298 F.Supp. 3d 279, 290 (D. Mass. 2018); see James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1250 (1st Cir. 1997). Improper conduct may exist if a party "used threats, misrepresented any facts [or] defamed anyone" in the course of the interference. Kahalas v. Schiller, 164 F. Supp. 3d 241, 246 (D. Mass. 2016) (quoting United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990) (alterations in original)). In the employment contract context, "a plaintiff cannot bring a [claim] against his own employer but may raise such a complaint against an 'individual official of the employer' if he can establish that the 'individual official induced the employer to breach plaintiff's employment contract with actual malice. '" See Eaton v. Town of Townsend, Nos. 22-1334, 22-1335, 2023 U.S. App. LEXIS 11381, at *36 (1st Cir. Mass., May 9, 2023) (citing Pierce v. Cotuit Fire Dist., 741 F.3d 295, 304 (1st Cir. 2014)) (emphasis added). The plaintiff does not have the burden to prove that the "improper interference was also malicious, unless the claim is raised by an employee suing an employer in an employment dispute. . . ." Kahalas v. Schiller, 154 F.Supp. 3d 241, 246 (D. Mass. 2016) (citing James L. Miniter Ins. Agency, 112 F.3d at 1250).

For this state law claim, the Court is not limited to the 300-day look back window in its analysis. Therefore, the Court considers all of the facts alleged in Martin's complaint. Defendants have argued both in their pleadings and at oral argument that Restagno and Guerra do not fall within the realm of supervisors or employers of Martin, and they argue that they had no official control over Martin's termination. Therefore, the burden to prove actual malice is not present in this claim against the Individual Defendants. See James L. Miniter Ins. Agency, 112 F.3d at 1250) ("[T]he third element requires merely an improper interference, not a malicious one.").

The Court finds that, after accepting all factual allegations as true and drawing all reasonable inferences in its favor, Martin sufficiently alleges that Defendants Guerra and Restagno interfered with her business relationship with WGC, leading to a significant loss of income in her bonus and her eventual termination. The Court also finds that it is reasonable to infer that Defendants did so through the improper motive of retaliation for Martin's August 2023 complaint, which led to Restagno stepping down from the WGC Board of Directors and Defendants' temporary suspension from the Club.

Accordingly, the complaint adequately sets forth a claim of intentional interference with contractual relations. Defendants' Motion to Dismiss Count X will be **DENIED.**

## IV.     CONCLUSION

For the reasons stated above, the Defendants' Motion to Dismiss, ECF No. 18, is **DENIED.**

**SO ORDERED.**

Dated: November 3, 2025

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge